# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CLAYTON A. LONG, SR.,**

**Plaintiff,**

**-vs-**                                                        **Case No.  6:10-cv-1673-Orl-GJK**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**
_____

## MEMORANDUM OF DECISION

On May 26, 2006, Clayton A. Long, Sr., (hereafter "Claimant") filed an application for Social Security disability insurance benefits (hereafter "Application"), alleging he became disabled on June 19, 2002.  R. 82.  The Application was denied initially and on reconsideration. R. 36, 38, 40.   Claimant requested reconsideration and a hearing was held before an Administrative Law Judge (hereafter "ALJ").  R. 49, 739-58.  On April 28, 2009, the ALJ issued his decision, denying the Application.  R. 16-24.   The Appeals Council denied review and Claimant timely appealed.  R. 6-8; Doc. No. 1.

Claimant raises three issues on appeal.  Doc. No. 14.  First, Claimant argues that the ALJ erred in not finding his mental impairments were severe because the ALJ did not apply the "special technique" as required by 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).  Doc. No. 14 at 15-16.   Claimant also contends the ALJ did not consider all his GAF scores, treatment records and "provided no explanation for rejecting the finding of a state agency medical consultant that Plaintiff experienced one or two episodes of decompensation."  Doc. No. 14 at 18-19.

1

Second, Claimant argues that the ALJ erred in determining he had the residual functional capacity (hereafter "RFC") to perform light work.  Doc. No. 14 at 19.  Claimant asserts the ALJ failed to state the weight he gave to Dr. Perdomo's opinion regarding Claimant's limitations and their effect on his ability to perform light work.  Doc. No. 14 at 29.  Claimant asserts the ALJ also "failed to adequately analyze Plaintiff's mental impairments in his RFC analysis."  Doc. No. 14 at 20-21.  Claimant also asserts that the ALJ erred in giving Dr. Thompson's RFC opinion no weight.  Doc. No. 14 at 21-22.

Third, Claimant argues that the ALJ improperly relied on the vocational expert's testimony because the ALJ did not include all Claimant's impairments when questioning the vocational expert.  Doc. No. 14 at 22.  Claimant also asserts the vocational expert's testimony conflicts with the Dictionary of Occupational Titles and that the ALJ did not properly consider or justify his rejection of Dr. Wiener's opinion in determining that Claimant could perform the job of garage cashier.  Doc. No. 14 at 23-24.

For the reasons discussed more fully below, the Commissioner's decision is **REVERSED AND REMANDED**.

## I.      MEDICAL AND OPINION EVIDENCE

Claimant has treated for a number of mental and physical conditions.

### A.  Treatment for Mental Conditions.

On July 27, 1998, Claimant appeared at Lakeside Alternatives complaining of depression and feelings of hopelessness.  R. 452.  Claimant was diagnosed with depression, given a GAF score of 45 and prescribed Luvox.  R. 453.  From April 2002 to December 2006, Claimant visited Lakeside Alternatives complaining of depression, hearing voices, anxiety and running out of medication.  R. 462-85, 602-21.  Claimant was given GAF scores ranging from 38-60 and

prescribed medications.  R. 464, 466-73, 476-77, 483, 604, 607, 609, 612, 615, 621.  While incarcerated from 2003 to 2006, Claimant was treated for auditory hallucinations, depression, insomnia, paranoia, delusions and schizophrenia.  R. 246, 258, 272, 277-79, 285-86, 419-35, 441-45.

### B.   Treatment for Physical Conditions.

The treatment Claimant has received for his physical conditions can primarily be traced to an August 20, 2002, incident where Claimant "slipped on way to chow" while incarcerated and was admitted to the emergency room for complaints of neck, back and shoulder pain.  R. 193-98.[1]

### 1.   Drs. Leverone, Laundau and Timken

On November 5, 2002, Dr. Richard A. Leverone, a radiologist, indicated that Claimant's right shoulder had "erosion of the distal articular surface of the clavicle compatible with osteolysis which may be traumatic in origin."  R. 202.  Dr. Leverone indicated that Claimant's cervical spine had "[m]inimal spondylosis," but no other "significant alignment abnormalities."  R. 202.  Dr. Leverone indicated that Claimant's lumbar spine revealed an old compression fracture at L1 with no definite evidence of recent fracture.  Mild to moderate spondylosis mainly at T12-L1, L1-2."  R. 202.  Dr. Leverone also indicated that there was "[h]yperextension of the lumbar lordosis, more significant at L5 with flexion of T12 on the compressed body of L1."  In regard to Claimant's thoracic spine, Dr. Leverone indicated that "[s]pondylosis is more pronounced at T12-L1 as described in the lumbar spine report.  No evidence of recent fracture" or "significant alignment abnormalities."  R. 203.

---

[1] While incarcerated during 2003 through 2006, Claimant was treated for complaints of chest pain, numbness in feet and pain in his hip.  R. 253-58, 287.  Claimant went to the emergency room after injuring a finger.  R. 374-75.

On November 21, 2002, Dr. Ronald I. Landau, a radiologist, performed an MRI of Claimant's right shoulder, indicating there was no evidence of a fracture, dislocation, contusion, bone bruise or joint effusion.  R. 204.  Dr. Laundau indicated that there were "[h]ypertropic changes . . . at the acromioclavicular joint resulting in mild to moderate cuff impingement," but no evidence of a rotator cuff tear.  R. 204.  Dr. Laundau opined that Claimant had a rotator cuff impingement.  R. 204.

On June 14, 2003, Dr. Mark J. Timken, a radiologist, reviewed an MRI of Claimant's cervical spine and indicated there was "hypertrophic uncovertebral joints narrowing the bilateral lateral recesses" at C2-3; "hypertrophic left uncovertebral joint narrowing the left lateral recess and left neural foramen" at C3-4 and C4-5; "hypertrophic left uncovertebral joint narrowing the medial aspect of the left neural foramen" at C5-6; and, at C6-7, "disc bulge, spondylosis and hypertrophy of the facets and ligamentum flava indenting the thecal sac and narrowing the left neural foramen."  R. 227-28.  Dr. Timken indicated that the MRI of Claimant's lumbar spine revealed "chronic-appearing anterior wedging of the L1 vertebral body without significant retropulsion;" loss of disc height and hydration at T12-L1; loss of disc hydration at L3-4; facet arthropathy at L4-5; and, at L5-S1, "disc bulge and spondylosis effacing the ventral epidural fat and, in combination with facet arthropathy, producing bilateral neural foraminal stenosis."  R. 229-30.

### 2.  St. Germain Chiropractic:  Drs. Menzies and Richard

From September 26, 2002 to November 5, 2003, Claimant received regular treatment from Drs. Paul Menzies and Keith C. Richard at St. Germain Chiropractic for the injuries he sustained in his August 2002 slip and fall accident.  R. 289-94, 303-44.  Drs. Menzies and

Richard documented the individual treatment sessions and periodically reevaluated Claimant to assess his recovery. R. 289-94, 303-44.

At his initial visit on September 26, 2002, Dr. Menzies opined that Claimant is "unable to work at this time. A work status will be determined at his next re-evaluation in 2-3weeks, or on his tenth visit." R. 291-92. Dr. Menzies' examination revealed Claimant's cervical muscles were weak on flexion, extension, left/right lateral flexion and left/right rotation. R. 292. Claimant's grip strength averaged twenty-one (21) pounds for his right hand and forty-three (43) pounds for his left hand. R. 292. Claimant's cervical, lumbar and shoulder ranges of motion were restricted and painful on flexion, extension and rotation. R. 292. Claimant's shoulder range of motion was also restricted and painful on "abduction and adduction in both shoulders." R. 292. Dr. Menzies diagnosed Claimant with upper extremity paresthesia, lower extremity radiculitis, thoracalgia and cervical, right shoulder and lumbar sprain/strain. R. 293. Dr. Menzies indicated that treatment would include chiropractic adjustments, ice, moist heat, electric muscle stimulation, intersegmental traction and trigger point therapy. R. 293.

On October 14, 2002, Dr. Menzies reevaluated Claimant to assess his recovery. R. 310-11. Dr. Menzies indicated that "bending and twisting at the waist as well as bending and turning his neck" aggravate Claimant's condition. R. 310. Dr. Menzies noted that Claimant "has made some improvement since initiating his treatment." R. 310. Claimant's cervical, lumbar and shoulder ranges of motion were restricted and painful on flexion, extension and rotation. R. 310. Claimant's shoulder range of motion was also restricted and painful on "abduction and adduction in both shoulders." R. 310. Claimant's grip strength averaged fifty-three (53) pounds for his right hand and eight-six (86) pounds for his left hand. R. 310. Dr. Menzies noted tenderness in the "bilateral cervical, thoracic and lumbar regions. Segmental motin [sic] restrictions still

5

palpated in cervical, thoracic and lumbar regions.  Tender points and trigger points palpated in cervical, thoracic and lumbar regions.  Hypertonicity palpated in cervical thoracic and lumbar regions."  R. 310.  Dr. Menzies indicated Claimant's treatment would "include more active therapies to increase strength, flexibility and endurance."  R. 311.  Dr. Menzies also indicated that "[w]e expect his prognosis to be improved on his next re-eval as a result of continued treatment intervention."  R. 311.

On November 20, 2002, Dr. Menzies reevaluated Claimant.  R. 318-20.  Dr. Menzies noted that lifting his right shoulder or performing activities of daily living aggravated Claimant's condition.  R. 318.  Dr. Menzies indicated that Claimant "reports some progress but looks forward to much furthur [sic] relief."  R. 318.  Claimant's cervical, lumbar and shoulder ranges of motion were restricted and painful on flexion, extension and rotation.  R. 318.  Claimant's shoulder range of motion was also restricted and painful on "abduction and adduction in both shoulders."  R. 318.  Claimant's grip strength averaged thirty-eight (38) pounds for his right hand and seventy-four (74) pounds for his left hand.  R. 318.  Dr. Menzies noted tenderness and spasms "over right deltoid, supraspinatus, upper trapezius.  Tender points palpated in cervical, thoracic and lumbar regions.  Segmental motion restrictions palpated in cervical, thoracic and lumbar regions."  R. 318.  Dr. Menzies noted subluxations in the cervical and lumbar spine, as well as the thoracic region.  R. 319.  Dr. Menzies indicated that further treatment is needed, further improvement is expected and "physical rehabilitation in a supervised setting will continue."  R. 319.

On December 27, 2002, Dr. Richard reevaluated Claimant.  R. 329-31.  Dr. Richard noted that "[r]ight shoulder movement and activities of daily living aggravate [Claimant's] condition."  R. 329.  Claimant's cervical, lumbar and shoulder ranges of motion were restricted

and painful on flexion, extension and rotation.  R. 329.  Claimant's shoulder range of motion was also restricted and painful on "abduction and adduction in both shoulders."  R. 329.  Claimant's grip strength averaged forty-two (42) pounds for his right hand and ninety (90) pounds for his left hand.  R. 329.  Dr. Richard noted tenderness and hypertonicity in Claimant's "right deltoid, supraspinatus, upper trapezius.  Tender trigger points palpated in cervical, thoracic and lumbar regions.  Segmental motion restrictions continue to be palpated in cervical, thoracic and lumbar regions."  R. 329.  Dr. Richard noted subluxations in the cervical, thoracic and lumbar spine.  R. 330.  Although Dr. Richard indicated that further treatment is needed and further improvement expected, he also indicated that Claimant's "condition is not stable.  It is expected he will be at MMI barring any unforeseen exacerbations and or flare-ups at the next re-evaluation."  R. 330.  Dr. Richard also indicated that "[a]ll rehab goals have been met and rehab was of benefit in his case."  R. 330.

On January 24, 2003, Dr. Menzies opined that Claimant sustained a six percent permanent impairment from his injuries and that he should expect "episodes of exacerbations from time to time."  R. 290.  On April 22, 2003, Dr. Richard wrote a letter indicating that Claimant "reached Maximum Medical Improvement on 1/24/03 and sustained a permanent impairment of 6% to the body as a whole as a result of this slip and fall accident."  R. 303.  Dr. Richard indicated that Claimant "may be considered disabled when it comes to his trained work related duties in his warehouse position which requires repetitive heavy lifting, bending, twisting and turning."  R. 303.  Dr. Richard further indicated that "[a]ll medical records should be considered in the determination of his full disability status and the determination of his work capabilities in any other profession or position."  R. 303.

On April 22, 2003, Dr. Richard reevaluated Claimant.  R. 337-39.  Dr. Richard indicated that shoulder movement and activities of daily living aggravate and exacerbate Claimant's condition.  R. 337.  Claimant's cervical, lumbar and shoulder ranges of motion were restricted and painful on flexion, extension and rotation.  R. 337.  Claimant's shoulder range of motion was also restricted and painful on "abduction and adduction in both shoulders."  R. 337.  Claimant's grip strength averaged sixty-five (65) pounds for his right hand and seventy-four (74) pounds for his left hand.  R. 338.  Dr. Richard noted tenderness and hypertonicity in Claimant's "right shoulder, upper trapezius, cervical and lumbar regions.  Trigger points continue in the cervical, thoracic and lumbar regions.  Segmental motion restrictions continue in the cervical, thoracic and lumbar regions."  R. 338.  Dr. Richard noted subluxations in the cervical, thoracic and lumbar region.  R. 338.  Dr. Richard indicated that Claimant's "condition continues to be stable with good and bad days and his condition fluctuates with episodes of exacerbations and flare-ups."  R. 338.  Dr. Richard indicated that Claimant is at "MMI with no change in impairment rating."  R. 339.

### 3.  Dr. Thompson

On August 26, 2003, Dr. Billy Thompson, Claimant's treating physician, completed a "Request for Medical Verification," diagnosing Claimant with chronic neck, back and shoulder pain.  R. 735.[2]  Dr. Thompson indicated that Claimant's conditions prevented him from employment and that the length of time Claimant would be prevented from working is "unknown."  R. 735.  Dr. Thompson indicated that pain prevents Claimant from performing physical work.  R. 735.  In response to the question of the duration of Claimant's illness or

---

[2] Dr. Thompson's treating records are not part of the record on appeal, although it appears they are listed as exhibit 14F in the List of Exhibits.  R. 4.

injury, Dr. Thompson indicated that Claimant was referred to orthopedics for an evaluation and it was "unknown" whether Claimant's conditions were temporary or permanent.  R. 735.

On October 15, 2003, Dr. Thompson completed a "Physical Residual Functional Capacity Questionnaire" indicating that he had treated Claimant on June 12, August 15 and October 15, 2003.  Dr. Thompson diagnosed Claimant with neck and low back pain.  R. 729.  Dr. Thompson indicated that Claimant experienced severe, constant pain that is worse when he stands, walks and moves in general.  R. 729.  Dr. Thompson indicated that Claimant has "[t]enderness to palpation of neck/right shoulder and low back to palpation and range of motion."  R. 729.  Dr. Thompson indicated that Claimant's impairments can be expected to last at least twelve months and that emotional factors contribute to Claimant's symptoms and functional limitations.  R. 729-30.  Dr. Thompson indicated that depression, anxiety, bipolar disorder and schizophrenia affect Claimant's physical condition.  R. 730.

Dr. Thompson opined that Claimant's pain and other symptoms are severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks. R. 730.  Dr. Thompson opined that Claimant is capable of performing low stress jobs.  R. 730. Dr. Thompson opined that Claimant can walk one-half of a block without experiencing severe pain or needing to rest.  R. 730.  Dr. Thompson opined that Claimant can sit or stand for ten minutes before needing to change positions.  R. 730-31.  Dr. Thompson opined that Claimant can sit, stand or walk less than two hours in an eight-hour workday, and would also need to walk around every ten minutes for ten minutes.  R. 731.  Dr. Thompson opined that Claimant would need a job that permits shifting positions at will and would often need to take unscheduled ten minute breaks.  R. 731.  Dr. Thompson also opined that Claimant needs to occasionally use a cane.  R. 731.

9

Dr. Thompson opined that Claimant can frequently lift and carry less than ten pounds, but can never lift and carry more than ten pounds.  R. 732.  Dr. Thompson opined that Claimant can occasionally look down, look up, turn his head right or left and hold his held in a static position. R. 732.  Dr. Thompson opined that Claimant can rarely twist, and can never stoop, crouch, or climb ladders or stairs.  R. 732.  Dr. Thompson opined that Claimant can never reach and has no limitations grasping, turning or twisting objects and can perform fine manipulations.  R. 732.  Dr. Thompson opined that Claimant would need to be absent more than four days per month as a result of his impairments and treatment.  R. 732.

On November 20, 2006, Dr. Thompson filled out another medical verification form.  R. 736.  Dr. Thompson indicated that Claimant is diagnosed with low back pain and is unable to work or participate in other activities such as school work or volunteering.  R. 736.  Dr. Thompson indicated that Claimant had been referred to orthopedics for treatment and a treatment plan.  R. 736.[3]

### 4.  Consulting Physician:  Dr. Perdomo

On October 16, 2006, Dr. Alex C. Perdomo examined Claimant for the Commissioner. R. 486-87.  Dr. Perdomo observed Claimant walk down a hall with a cane and noted that he could "walk without the cane for a distance of approximately twenty feet without major problems."  R. 486.  Dr. Perdomo indicated that Claimant "appeared to be in pain while sitting in the examining room and was observed to change positions often.  He was able to move from the chair to the examining table with no need of assistance."  R. 486.

Dr. Perdomo's examination of Claimant's extremities revealed "trace pitting edema, but no cyanosis, clubbing or ulceration with good distal pulses."  R. 487.  Dr. Perdomo indicated that

---

[3] The record does not contain any treatment records from an orthopedist.

Claimant's range of motion in his upper extremities "was affected at the level of the shoulders with abduction limited to 90 degrees due to radiating pain into the upper and lower back." R. 487. Dr. Perdomo indicated that Claimant had full range of motion in his lower extremities but bilateral hip flexion was painful due to "pain radiating into the lower back." R. 487. Dr. Perdomo also indicated that Claimant was "able to squat, and stand on his toes and heels due to complaints of severe lower back pain." R. 487.

In examining Claimant's back, Dr. Perdomo found "diffuse tenderness over the lumbar paraspinal muscles and spinous processes, as well as the upper thoracic paraspinal muscles." R. 487. Dr. Perdomo found Claimant's range of motion in his cervical spine was "decreased with forward flexion and extension 30 degrees, lateral flexion 30 degrees both right and left, rotation 65 degrees both right and left. Thoracolumbar spine forward flexion 30 degrees, extension 0 degrees, lateral flexion and rotation 10 degrees both right and left with movements very slow and painful. Positive bilateral straight leg raise was obtained in both supine and sitting positions." R. 487.

Dr. Perdomo's neurological examination revealed that Claimant had normal sensory, motor, and deep tendon reflexes, as well as normal coordination and station. R. 487. Claimant had normal grip strength, normal fine manipulation and did not have any neurological gait deficits. R. 487. Claimant's mental status exam was normal. R. 487.

Dr. Perdomo gave four impressions: 1) "history of chronic back pain with severe musculoskeletal functional limitations on physical examination of the cervical and thoracolumbar spine, as well as bilateral lower extremity radiculopathy;" 2) "history of right shoulder rotator cuff tear with chronic pain;" 3) obesity; and 4) elevated blood pressure. R. 487. Dr. Perdomo opined that Claimant would benefit from losing weight, physical therapy, a "home

exercise program for back conditioning" and a referral to a pain management specialist.  R. 487.

Dr. Perdomo opined that Claimant can "stand, walk, and sit for four hours in an eight-hour

workday with normal breaks.  [Claimant] should be allowed to use a cane for ambulation if

required to walk distances over thirty feet.  He should also avoid bending, stooping, or

crouching.  No manipulative limitations were seen."  R. 487.

### 5.  State Agency Consultants

On November 1, 2006, Dr. Minerva Hernandez reviewed Claimant's medical records and

completed a physical RFC assessment.  R. 488-95.  Dr. Hernandez opined that Claimant could

occasionally lift twenty pounds and frequently lift ten pounds.  R. 489.  Dr. Hernandez opined

that Claimant could stand, walk and/or sit six hours in an eight-hour workday.  R. 489.  Dr.

Hernandez opined that Claimant's ability to push and/or pull was unlimited.  R. 489.  Dr.

Hernandez opined that Claimant could occasionally crawl, crouch, kneel, stoop, balance and

climb ramps, stairs, ladders, ropes or scaffolds.  R. 490.  Dr. Hernandez opined that Claimant's

ability to reach in all directions was limited to frequently and that Claimant had no visual,

communicative or environmental limitations.  R. 491-92.  Dr. Hernandez opined that the

symptoms alleged by Claimant were partially credible and that he was capable of a "LIGHT

RFC."  R. 493.

On November 7, 2006, Dr. Thomas Conger, a psychological consultant, completed a

mental RFC assessment after reviewing Claimant's medical records.  R. 496-98.  Dr. Conger

opined that Claimant was moderately limited in four respects:  1) ability to maintain attention

and concentration for extended periods; 2) ability to complete a workday or work week without

interruptions and perform at a consistence pace without rest periods that were unreasonable in

number and length; 3) ability to accept instruction and appropriately respond to criticism from

supervisors; and 4) ability to get along with coworkers without distracting them or "exhibiting behavioral extremes." R. 496-97. Dr. Conger opined that Claimant is "mentally capable of performing simple, repetitive tasks on a sustained basis. He may also experience some social difficulties as well as a negative reaction to criticism, but he shows the ability to relate effectively in general. He is judged to have adequate understanding and adaptation abilities." R. 498.

Dr. Conger also completed a "Psychiatric Review Technique." R. 500-13. Dr. Conger diagnosed Claimant with "Schizoaffective Disorder, in partial remission" and a substance addiction disorder. R. 502, 508. Dr. Conger opined that Claimant had no episodes of decompensation, has a mild restriction on his ability to perform activities of daily living and has moderate difficulties in maintaining social functioning, concentration, persistence or pace. R. 510. Dr. Conger noted that Claimant was "physically limited to some extent" but can perform routine activities of daily living. R. 512. Dr. Conger noted that Claimant's allegations of psychotic symptoms were not credible and unsupported by any evidence. R. 512. Dr. Conger noted that Claimant "is mentally capable of performing tasks independently," has the ability to "relate in a socially appropriate manner" and, ultimately, "appears to be primarily limited by his physical difficulties and there is no indication of a mental impairment that would meet or equal any listing at this time." R. 512.

On February 19, 2007, Dr. Mary Payne reviewed Claimant's medical records and completed a physical RFC assessment. R. 628-35. Dr. Payne opined that Claimant can occasionally lift twenty pounds and frequently lift ten pounds. R. 629. Dr. Payne opined that Claimant can stand, walk and/or sit six hours in an eight-hour workday. R. 629. Dr. Payne opined that Claimant's ability to push and/or pull is unlimited. R. 629. Dr. Payne opined that

Claimant can occasionally crawl, crouch, kneel, stoop, balance and climb ramps, stairs, ladders, ropes or scaffolds.  R. 630.  Dr. Payne opined that Claimant's ability to reach overhead with his right shoulder is limited to frequently, but there are no reaching limitations on his left shoulder. R. 631.  Dr. Payne opined that Claimant has no visual, communicative or environmental limitations.  R. 631-32.  Dr. Payne opined that the symptoms alleged by Claimant are "out of proportion" to the medical evidence of record and to "the 6% impairment rating per chiropractic . . . ."  R. 633.

On March 3, 2007, Dr. Eric Wiener reviewed Claimant's medical records and completed a mental RFC assessment.  R. 636-38.  Dr. Wiener opined that Claimant is moderately limited in his ability to understand, remember and carry out detailed instructions.  R. 636.  Dr. Wiener opined that Claimant is moderately limited in his ability to maintain attention and concentration for extended periods.  R. 636.  Dr. Wiener also opined that Claimant is moderately limited in his ability to complete a workday or work week without interruptions, perform at a consistence pace without rest periods that were unreasonable in number and length, accept instruction and appropriately respond to criticism from supervisors and get along with coworkers without distracting them or "exhibiting behavioral extremes."  R. 637.  In offering his functional capacity assessment, Dr. Wiener opined that Claimant seems "mentally capable of independently performing basic, routine tasks in a low demanding work environment," but may "need well spaced work environment with only brief interactions with others and supportive, non confrontational supervisors."  R. 638.  Dr. Wiener noted that Claimant uses public transportation and appears "capable of negotiating usual work hazards and changes."  R. 638.

On March 8, 2007, Dr. Wiener completed a "Psychiatric Review Technique."  R. 640-53. Dr. Wiener diagnosed Claimant with "Schizoaffective Disorder."  R. 643.  Dr. Wiener opined

that Claimant is moderately limited in his ability to perform activities of daily living, maintain social functioning and maintain concentration, persistence or pace. R. 650. Dr. Wiener also opined that Claimant had one or two episodes of decompensation that were of extended duration. R. 650. Dr. Wiener opined that Claimant performs limited shopping, cooking and chores "due mostly to physical symptoms." R. 652. Dr. Wiener indicated that Claimant can use public transportation, pay bills and uses a check book. R. 652. Dr. Wiener opined that Claimant's activities of daily living indicate "both medical and mental (difficulty with memory/concentration/getting along with others) limitations. Overall, the claimant has credible emotional issues that impose limits though less than marked (see RFC)." R. 652.

## II.   ADMINISTRATIVE PROCEEDINGS

On January 28, 2009, the ALJ conducted a hearing, at which Claimant and a vocational expert testified. R. 739-58. At the beginning of the hearing Claimant amended his Application to allege a disability onset date of January 20, 2005. R. 740. Claimant testified that he was born on March 8, 1964, and lives with his brother-in-law. R. 740-41. Claimant testified that he was incarcerated from 2003 through 2006. R. 742. Claimant testified that he previously worked as a warehouse worker, which requires a lot of bending, squatting, stooping and lifting items up to forty-five (45) pounds. R. 743. Claimant testified that he has had back problems since his car accident in the 1980's and that since 2005, he has been told he has bulging disk and a "fractured L1-L2 to solar plexus." R. 744.

Claimant testified that he walks with a cane because his leg sometimes gives out. R. 744. Claimant testified that he can walk up to a block before he begins to have anxiety, his heart starts fluttering and pain starts radiating down his left side to his toes. R. 744-45. Claimant testified that he can sometimes stand up to thirty minutes and can sit, on average, for twenty to twenty-

five minutes.  R. 745-56.  Claimant testified that he has to lie down or elevate his feet three to four times a day for thirty minutes to an hour.  R. 746.  Claimant testified that he can lift five pounds and if he tries to lift more than that he pulls something in his back.  R. 746.

Claimant testified that he was born with a heart condition where both of his arteries "is coming in on, on my left side" and when he gets "upset they close down on each other."  R. 746-47.  Claimant testified that he takes nitroglycerin, aspirin and watches his diet for his heart problem.  R. 747.  Claimant testified that he has trouble concentrating, staying on task and following directions.  R. 747.  Claimant testified that he has been diagnosed with paranoid schizophrenia, bipolar disorder, post-traumatic stress disorder, schizoaffective disorder and depression.  R. 747.  Claimant testified that he has tried to commit suicide and has been Baker acted.  R. 748.  Claimant testified that he has taken Seroquel, Zyprexa and Lexapro for his mental health issues.  R. 748.

Claimant testified that he has trouble getting along with coworkers, supervisors and people in general because sometimes he does not want to bothered and it seems people are making fun of him.  R. 748-49.  Claimant testified that he has problems bathing, shaving and grooming himself.  R. 749.  Claimant testified that he tries to perform household chores, but cannot stay focused.  R. 749.  Claimant testified that he cooks microwavable foods.  R. 749.  Claimant testified that he is not involved in any social or recreational activities.  R. 750.

Claimant testified that he takes hydrocodone, Lortab and over the counter medication for his pain.  R. 750.  Claimant testified that his medications cause him to be constipated and drowsy.  R. 750.  Claimant testified he has trouble sleeping because he is constantly in discomfort, hears voices and becomes paranoid.  R. 750-51.  Claimant testified he still hears voices despite taking his medications.  R. 751.  Claimant testified that he spends his day from a

chair to the couch to the bed and everyday is "just a constant isolation." R. 752.

The vocational expert testified that Claimant's past work as a warehouse worker was unskilled medium work, with an SVP of 2. R. 754. The ALJ asked the vocational expert whether a person with the following limitations could perform Claimant's past work:

1. 11th grade education;

2. Ability to understand, remember and carry out detailed instructions is moderately limited;

3. Ability to maintain concentration and attention for an extended period of time is moderately limited;

4. Can occasionally climb, balance, stoop, kneel, crouch and crawl;

5. Unlimited ability to reach; and

6. Can perform simple, repetitive light work.

R. 754-55. The vocational expert testified that this hypothetical person could not perform Claimant's past work, but could work as a garage cashier. R. 755.

The ALJ then asked what jobs a hypothetical person with the following limitations could perform:

1. can perform low stress jobs;

2. can walk half a block;

3. can sit for ten minutes;

4. can sit, stand or walk for less than four hours in an eight-hour day;

5. would need to shift from sitting, standing or walking at will;

6. would need to take unscheduled breaks often;

7. can frequently lift and carry ten pounds;

    8.  can occasionally turn head in all directions or hold head static;

    9.  can rarely twist;

    10. can never stoop, crouch or climb; and

    11. ability to repetitively reach, handle or finger is significantly limited.

R. 755-56.  The vocational expert testified that this hypothetical person could not perform any job in the national economy.  R. 756.

In his decision, the ALJ found that Claimant suffered from the severe impairments of "osteolysis and impingement syndrome of the right shoulder, and spondylosis of the cervical and lumbar spine."  R. 18 (internal citations omitted).  The ALJ found that Claimant "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 19 (internal citations omitted).  In making these findings, the ALJ also discussed the medical evidence concerning Claimant's mental impairments.  R. 19-20.

The ALJ indicated that while incarcerated, Claimant was diagnosed with and received treatment for bipolar disorder and paranoid schizophrenia.  R. 19.  After being released from prison, the ALJ indicated that Claimant "sought out-patient treatment on August 22, 2006 and at this time he was assessed to have a Global Assessment of Functioning Score of 38."  R. 19.  The ALJ indicated that an August 24, 2006 treatment record indicates that the medication Claimant was taking was working well and he was assessed a Global Assessment Functioning Score (hereafter "GAF") of 60.  R. 20.  The ALJ noted that on December 21, 2006, Claimant "demonstrated normal speech, fair recent and remote memory, fair concentration, adequate appearance, appropriate motor activity, cooperative behavior, fair insight, and fair judgment."  R. 20.

The ALJ made the following findings concerning Claimant's mental impairments:

> [C]laimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or on average of once every 4 months, each lasting for at least two weeks.
>
> In activities of daily living, the claimant has moderate restriction. The claimant noted difficulties with activities of daily living, but is at least able to meet his basic personal needs.
>
> In social functioning, the claimant has moderate difficulties. The claimant described social isolation, but retains the ability to interact with others as demonstrated by his current living arrangement. He testified living with his brother-in-law.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. While the claimant may be reasonably limited from performing complex and/or detailed oriented tasks, he is not similarly precluded from performing the demands of simple repetitive work.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The claimant is responsive to medication when taken as prescribed and directed.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked limitations and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the

presence of the "paragraph C" criteria.  The claimant is able to function outside the home independently.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

R. 20-21.  Thus, the ALJ found that Claimant's mental impairments did not meet or equal a listing, but included mental limitations in assessing Claimant's RFC.

The ALJ found that Claimant had the RFC to "perform light work . . . with occasional postural limitations and the ability to perform simple, repetitive work."  R. 21.  The ALJ evaluated Claimant's credibility and found that Claimant's testimony concerning the "alleged degree of problems and limitations" is not supported by the medical record as the treatment has been conservative and "there is no evidence of gross or marked physical deficits."  R. 22.  The ALJ further indicated that Dr. Perdomo opined that Claimant could perform light work "and subsequent evidence since then does not negate the ability for light work."  R. 22.

In regard to weighing the medical opinions, the ALJ gave no weight to Dr. Thompson's October 15, 2003, Physical Residual Functional Capacity Questionnaire because the "degree of limitations assessed is overwhelmingly contrary to longitudinal evidence and findings dated after 2003."  R. 22.  The ALJ also gave no weight to Dr. Thompson's opinion, set forth in a medical verification form, that Claimant could not work because it was vague, imprecise and Dr. Thompson failed to "provide a function by function analysis of claimant's abilities and

limitations as set forth in Social Security Ruling 96-8p." R. 22. The ALJ also indicated that Dr.

Thompson failed to provide an "adequate explanation of how and why the evidence supports the

conclusion and/or fails to adequately identify objective clinical signs, diagnostic studies, or

laboratory findings in support of the conclusions." R. 22. Finally, the ALJ indicated that Dr.

Thompson's opinion was an issue reserved to the Commissioner. R. 22.

In regard to the opinions of the other physicians of records, the ALJ stated the following:

> The undersigned has also considered the opinions of the State agency medical consultants and gives them weight to the extent they are consistent with the body of evidence as a whole. These opinions determined the claimant to have the physical residual functional capacity for light work with occasional postural limitations and limited reaching in all directions. The claimant was also found to have no more than moderate mental limitations with moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation.

> In sum, the above residual functional capacity assessment is supported by longitudinal record, the opinion of the consultative examiner, direct observations at the hearing, and the opinions of the State agency medical consultants.

R. 22. Thus, the ALJ indicates that he considered the opinions of the State agency medical

consultants and gave them weight consistent with the evidence as a whole.

The ALJ found that Claimant could not perform his past relevant work. R. 22-23. The

ALJ found, based on the vocational expert's testimony, that Claimant could work as a "garage

cashier/parking lot attendant with 10,500 jobs available in the state and 200,000 nationally." R.

23. Thus, the ALJ determined that Claimant was not disabled. R. 24.

## III.   THE PARTIES' POSITIONS

As outlined above, Claimant raises numerous issues on appeal.  Doc. No. 14 at 15-24. The issue the Court finds dispositive is the ALJ's failure to state the weight he gave to Dr. Perdomo's RFC opinion.  Claimant notes that the ALJ "referenced Dr. Perdomo's report but did not reference or discuss the limitations . . . in the context of the Residual Functional Capacity analysis (though he does mention them is [sic] his discussion of whether [Claimant] has an impairment or combination of impairments that meets or medical [sic] equals one of the listed impairments."  Doc. No. 14 at 20 (internal citation omitted).  Claimant argues that the ALJ did not "explain the weight given to Dr. Perdomo's opinion regarding the limitations that he recommended, including that [Claimant] be allowed to use a cane for ambulation if required to walk distances over thirty feet."  Doc. No. 14 at 20.  Claimant also argues that "[e]ven if he had addressed the limitations recommended by Dr. Perdomo, the ALJ's selected residual functional capacity would still be flawed as those limitations are inconsistent with the RFC stated by the ALJ."  Doc. No. 14 at 20.

The Commissioner proffers the following argument in opposition:

> the record showed that [Claimant's] treatment of his conditions was largely conservative and there was no evidence of gross or marked physical deficits.  The ALJ considered that from 2002 and 2003, [Claimant's] initial treatment for his neck, shoulder, and back pain consisted primarily of chiropractic care, and he had not required surgical intervention.  His chiropractor, Keith C. Richard, DC opined in August 2002 only that [Claimant] should not perform duties that required "repetitive heavy lifting, bending, twisting, and turning."  The ALJ also considered that Dr. Alex C. Perdomo, a consultative examiner, examined [Claimant] in October 2006 and found that [Claimant] had full range of motion of the lower extremities; intact sensation; normal motor and deep tendon reflexes; normal coordination and station; no neurological gait deficits; and normal grip strength.  Dr. Perdomo also observed that [Claimant] was able to walk without a cane for twenty feet

22

> without major problems.   Other physical exams yielded similar
> findings.   This evidence supports the ALJ's determination that
> [Claimant] could perform light work with occasional postural
> limitations.

Doc. No. 16 at 13 (internal citations omitted).   Thus, the Commissioner argues that because

Claimant's treatment was largely conservative, did not require surgery, Dr. Perdomo's physical

examination was essentially normal and Dr. Richard merely indicated that Claimant should avoid

repetitive heavy lifting, bending, twisting and turning, that the ALJ properly determined that

Claimant could perform light work with postural limitations.

## IV.   LEGAL STANDARDS

### A.   THE ALJ'S FIVE-STEP DISABILITY ANALYSIS

Under the authority of the Social Security Act, the Social Security Administration has

established a five-step sequential evaluation process for determining whether an individual is

disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a).   In *Doughty v. Apfel*, 245 F.3d 1274, 1278

(11th Cir. 2001), the Eleventh Circuit explained the five-step sequential evaluation process as

follows:

> In order to receive disability benefits, the claimant must prove at
> step one that he is not undertaking substantial gainful activity. At
> step two, the claimant must prove that he is suffering from a severe
> impairment or combination of impairments. At step three, if the
> claimant proves that his impairment meets one of the listed
> impairments found in Appendix 1, he will be considered disabled
> without consideration of age, education, and work experience. If
> the claimant cannot prove the existence of a listed impairment, he
> must prove at step four that his impairment prevents him from
> performing his past relevant work. At the fifth step, the regulations
> direct the Commissioner to consider the claimant's residual
> functional capacity, age, education, and past work experience to
> determine whether the claimant can perform other work besides his
> past relevant work.

*Id.* (citations omitted). The steps are followed in order.  If it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

### B.      STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).   The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.   *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). The District Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).

### C.      REMEDIES

Congress has empowered the District Court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  To remand under sentence four, the District Court must either find that the Commissioner's decision applies the incorrect law, fails to provide the court with sufficient reasoning to determine whether the proper law was applied, or is not supported by substantial evidence.  *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (reversal and remand appropriate where ALJ failed to apply correct law or the ALJ failed to provide sufficient reasoning to determine where proper legal analysis was conducted) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)); *Jackson v. Chater*, 99 F.3d 1086, 1090-91 (11th Cir. 1996) (remand appropriate where ALJ failed to develop a full and fair record of claimant's RFC); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for District Court to find claimant disabled).

This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984).  A claimant may also be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).  The District Court may remand a case to the Commissioner for a rehearing under sentences four or

six of 42 U.S.C. § 405(g); or under both sentences. *Jackson*, 99 F.3d at 1089-92, 1095, 1098. Where the District Court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 827, 829- 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work).[4]

## V.    ANALYSIS

Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the ALJ's sequential evaluation process for determining disability.   The Eleventh Circuit recently clarified the standard the Commissioner is required to utilize when considering medical opinion evidence.   In *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1178-79 (11th Cir. 2011), the Eleventh Circuit held that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor.   *Id*. (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).   The Eleventh Circuit stated that "'[i]n the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'" *Winschel*, 631 F.3d at

---

[4] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).   After a sentence-four remand, the District Court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

1178-79 (quoting *Cowart v. Schwieker*, 662 F.2d 731, 735 (11th Cir. 1981) (emphasis added)). *See also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (failure to state with particularity the weight given to opinions and the reasons therefor constitutes reversible error); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (failure to clearly articulate reasons for giving less weight to the opinion of treating physician constitutes reversible error).

In *Winschel*, the Commissioner argued that the ALJ did not err by failing to state the weight he gave to a treating physician's treatment notes and the reasons therefor because they did not constitute an "opinion." *Id*. at 1178-79.   The Eleventh Circuit disagreed because the treatment notes contained "a description of Winschel's symptoms, a diagnosis, and a judgment about the severity of his impairments, and clearly constituted a 'statement[] from [a] physician . . . that reflect[s] judgments about the nature and severity of [Winschel's] impairment(s), including [Winschel's] symptoms, diagnosis and prognosis, what [Winschel] can still do despite impairment(s), and [Winschel's] physical or mental restrictions.'"   *Id*. (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). Thus, the treating physician's treatment notes constituted an opinion.   *Id*.   The Eleventh Circuit noted that the ALJ only referenced the treating physician once and did not state the weight given to the treating physician's opinion. *Id*.   The Eleventh Circuit reversed stating that "[i]t is possible that the ALJ considered and rejected these . . . medical opinions, but without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence." *Id*. (emphasis added).

In *McCloud v. Barnhart*, 166 F. App'x. 410, 418 (11th Cir. 2006), a consulting psychologist opined the claimant could not sustain concentration and work for extended periods

27

of time.[5]   In the decision finding claimant not disabled, the ALJ found that claimant only had moderate deficiencies in concentration, persistence or pace.  *Id.*  The Eleventh Circuit stated that an ALJ is required to "state with particularity the weight he gives to different medical opinions and the reasons why."  *Id.*  The Eleventh Circuit reversed because the ALJ did not explain the weight given to the consulting psychologist's report or why the ALJ discredited the consulting psychologist's "findings regarding [claimant's] ability to engage in prolonged work."  *Id.* at 419.

In the case at bar, the ALJ stated reasons why he gave Dr. Thompson's opinions no weight.   R. 22.   In making his RFC determination, the ALJ indicated that "Dr. Perdomo determined the claimant had the capacity to perform work characterized by the above residual functional capacity and subsequent evidence since then does not negate the ability for light work."  R. 22.  The ALJ also stated that he "considered the opinions of the State agency medical consultants and gives them weight to the extent they are consistent with the body of evidence as a whole.   These opinions determined the claimant to have the physical residual functional capacity for light work with occasional postural limitations and limited reaching in all directions."  R. 22.  Thus, the ALJ relied on both Dr. Perdomo's opinion and those of the state agency consultants in determining Claimant's RFC.

The ALJ's statement that Dr. Perdomo's opinion supports his RFC finding is not supported by substantial evidence.  Dr. Perdomo opined that Claimant could stand, walk and sit for four hours in an eight-hour workday and should avoid bending, stooping or crouching.  R. 437.  Light work requires "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  Light work also requires standing or walking for approximately six hours in an eight-hour workday.  *Popock v.*

---

[5]  Unreported Eleventh Circuit decisions are not binding, but may be cited as persuasive authority.

*Astrue*, 374 F. App'x. 903, 905 (11th Cir. 2010).  Dr. Perdomo's opinion does not support the

ALJ's finding that Claimant can perform light work.[6]

The ALJ references Dr. Perdomo's and the state agency physicians' opinions, but does

not state the weight he gave to these opinions.  The ALJ cited Dr. Perdomo's opinion in support

of his RFC determination, but his opinion, in fact, is conflicting.  Thus, the ALJ implicitly

discounted, partially or totally, Dr. Perdomo's opinion in determining that Claimant can perform

light work with occasional postural limitations.  The conflict between Dr. Perdomo's opinion and

the ALJ's RFC finding leaves the Court unable to determine what weight the ALJ gave to Dr.

Perdomo's opinion.  The ALJ clearly did not state the weight he gave or the reason for

discrediting, partially or totally, Dr. Perdomo's opinion.  Consequently, the Court cannot

determine whether the ALJ's conclusion is rational and supported by substantial evidence.  *See*

*Winschel*, 631 F.3d at 1178-79; *McCloud*, 166 F. App'x. at 419.  Accordingly, the ALJ erred in

failing to state the weight he gave to Dr. Perdomo's opinion and the reasons therefor.

Although not raised by either party, the Court also briefly addresses the ALJ's rejection

of Dr. Thompson's October 15, 2003 Physical Residual Functional Capacity Questionnaire.  The

ALJ rejected Dr. Thompson's opinion because the "limitations assessed is [sic]

overwhelming[ly] contrary to longitudinal evidence and findings dated after 2003."  R. 22.  The

ALJ does not explain what longitudinal evidence he relied on to support this finding.  General

statements "that an opinion is inconsistent with or not bolstered by the medical record are

insufficient to show an ALJ's decision is supported by substantial evidence unless the ALJ

articulates a factual basis for such a blanket statement."  *Jusick v. Comm'r of Soc. Sec.*, No. 6:10-

---

[6] Dr. Perdomo's opinion also does not support the ALJ's finding that Claimant's ability to perform light work was limited by "occasional postural limitations."  Dr. Perdomo opined that Claimant should avoid bending, stooping or crouching, not that he should only occasionally do so.  R. 437.

cv-126-Orl-GJK, 2011 WL 1059106 at *11 n. 7 (M.D. Fla. Mar. 21, 2011); *see also Poplardo v. Astrue*, No. 3:06-cv-1101-J-MCR, 2008 WL 68593 at *11 (M.D. Fla. Jan. 4, 2008) (failure to specifically articulate evidence contrary to treating doctor's opinion requires remand); *Paltan v. Comm'r of Soc. Sec.*, No. 6:07-cv-932-Orl-19DAB, 2008 WL 1848342 at *5 (M.D. Fla. April 22, 2008) ("The ALJ's failure to explain how [the treating doctor's] opinion was 'inconsistent with the medical evidence' renders review impossible and remand is required.").  The Court notes that Dr. Thompson's treating records are not part of the record on appeal, although it appears they are listed as exhibit 14F in the List of Exhibits.  R. 4.  If the ALJ rejects Dr. Thompson's opinions on remand, the ALJ must specifically articulate the evidence that supports the rejection of Dr. Thompson's opinions.

## VI.   **CONCLUSION**

Based on the foregoing, it is **ORDERED** that the Commissioner's decision is **REVERSED and REMANDED**, pursuant to sentence four of Section 405(g).  The Clerk is directed to enter Judgment in favor of Claimant and close the case.

**DONE** and **ORDERED** in Orlando, Florida on March 30, 2012.

_____
GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

The Court Requests the Clerk Mail
or Deliver Copies of this Order to:

Paul J. Morgan
Paul J. Morgan and Associates, P.A.
1099 W. Morse Blvd.
Winter Park, Florida 3278

John F. Rudy, III
U.S. Attorney's Office

Suite 3200
400 N. Tampa St.
Tampa, Florida  33602

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Douglas Wilson, Branch Chief
Laura A. Verduci, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia  30303-8920

The Honorable Apolo Garcia
Administrative Law Judge
c/o Office of Disability Adjudication and Review
Suite 300
3505 Lake Lynda Dr.
Orlando, Florida  32817-9801